UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------x
                              :
ROBIN L. KNUDSEN              :
                              :
v.                            : CIV. NO. 3:14CV00785(SALM)
                              :
CAROLYN W. COLVIN, ACTING     :
COMMISSIONER, SOCIAL SECURITY :
ADMINISTRATION                : June 10, 2015
                              :
------------------------------x

## RECOMMENDED RULING ON CROSS MOTIONS

Plaintiff Robin L. Knudsen brings this action pursuant to 42 U.S.C. §405(g), seeking review of a final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. §401 et seq. and Title XVI Supplemental Security Income ("SSI").  Plaintiff has moved to reverse the Commissioner's decision or, in the alternative, to remand the case for a rehearing. The Commissioner has moved to affirm.

For the reasons set forth below, plaintiff's Motion to Reverse the Decision of the Commissioner (**Doc. #17**) is **DENIED**. Defendant's Motion for an Order Affirming the Decision of the Commissioner (**Doc. #18**) is **GRANTED**.

## I.   PROCEDURAL HISTORY

Plaintiff filed applications for SSI and DIB on August 23, 2011, alleging disability as of September 15, 2010.  (Certified Transcript of the Record, Compiled on July 24, 2014 (hereinafter "Tr.") 17). Her claims for SSI and DIB were denied initially on

1

December 16, 2011, and were also denied upon reconsideration on March 7, 2012.  Id.  Plaintiff requested a timely hearing before an Administrative Law Judge ("ALJ") on March 7, 2012.  Id.

On December 5, 2012, Administrative Law Judge Matthew Kuperstein held a hearing at which plaintiff appeared with counsel and testified. (Tr. 43-104).  On March 29, 2013, the ALJ found that plaintiff was not disabled and denied her claims. (Tr. 17-35).  Plaintiff filed a timely request for review of the hearing decision and on April 30, 2014, the Appeals Council denied review, thereby rendering ALJ Kuperstein's decision the final decision of the Commissioner. (Tr. 1-6). The case is now ripe for review under 42 U.S.C. §405(g).

Plaintiff, represented by counsel, timely filed this action for review and moves to reverse the Commissioner's decision.

## II.  STANDARD OF REVIEW

The scope of review of a social security disability determination involves two levels of inquiry. The court must first decide whether the Commissioner applied the correct legal principles in making the determination. Next, the court must decide whether the determination is supported by substantial evidence. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971); Yancey v. Apfel, 145 F.3d 106, 110 (2d Cir. 1998). The substantial evidence rule also applies to inferences and

conclusions that are drawn from findings of fact. <u>Gonzales v. Apfel</u>, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); <u>Rodriguez v. Califano</u>, 431 F. Supp. 421, 423 (S.D.N.Y. 1977). The court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. <u>Dotson v. Shalala</u>, 1 F.3d 571, 577 (7th Cir. 1993). In reviewing an ALJ's decision, the court considers the entire administrative record. <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996). The court's primary responsibility is to ensure that a claim has been fairly evaluated. <u>Grey v. Heckler</u>, 721 F.2d 41, 46 (2d Cir. 1983).

Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold the ALJ's decision "creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." <u>Schaal v. Apfel</u>, 134 F.3d 496, 504 (2d Cir. 1987). To enable a reviewing court to decide whether the determination is supported by substantial evidence, the ALJ must set forth the crucial factors in any determination with sufficient specificity. <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984). This rule applies equally to credibility findings. Thus, although the ALJ is free to accept or reject the testimony of any witness, a finding that the witness is not credible must be set forth with sufficient specificity to permit meaningful review of the record. <u>Williams ex rel. Williams v. Bowen</u>, 859 F.2d 255, 260-61 (2d Cir. 1988). Moreover, when a finding is potentially dispositive on the issue of disability,

there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding. Peoples v. Shalala, No. 92 CV 4113, 1994 WL 621922, at *4 (N.D. Ill. 1994); see generally Ferraris, 728 F.2d at 587.

## III. STANDARD FOR FINDING OF DISABILITY

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. See 42 U.S.C. §423(a)(1)(E). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. §404.1520. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. §404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. See 20 C.F.R. §404.1520(b). If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. §404.1520(c). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. §404.1520(d); Bowen v. Yuckert, 482 U.S. 137 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the

4

Listings, the claimant is automatically considered disabled. See 20 C.F.R. §404.1520(d); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, at a fourth step, he will have to show that he cannot perform his former work. See 20 C.F.R. §404.1520(e)-(f). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. §404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity by using the Medical-Vocational Guidelines set forth in the SSA Regulations ["the Grid"]. See 20 C.F.R. §416.945(a) (defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations). The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled. A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are

not covered. See 20 C.F.R. Part 404, Subpart P, App. 2, 20
C.F.R. §200.00(e)(1). If the Grid cannot be used, i.e., when
nonexertional impairments are present or when exertional
impairments do not fit squarely within Grid categories, the
testimony of a vocational expert is generally required to
support a finding that employment exists in the national economy
which the claimant could perform based on his residual
functional capacity. See Pratts v. Chater, 94 F.3d 34, 39 (2d
Cir. 1996).

**IV.  ISSUES PRESENTED**

On appeal, the Court considers the plaintiff's following
arguments in favor of reversal or remand, as clarified by the
plaintiff in her reply brief:

1. Whether the ALJ mischaracterized the evidence;

2. Whether the ALJ's Step Three determination was supported
by substantial evidence;

3. Whether the ALJ complied with the treating source rule;

4. Whether the ALJ properly evaluated plaintiff's
credibility; and

5. Whether the ALJ's Step Five and RFC determinations were
supported by substantial evidence.

**V.  ALJ'S DECISION**

Following the five step evaluation process, ALJ Kuperstein
concluded that plaintiff was not disabled under the Social
Security Act. (Tr. 35).  The ALJ initially determined that

plaintiff met the insured status requirements of the Social
Security Act through December 31, 2011.  (Tr. 20).  At step one,
the ALJ found that plaintiff had not engaged in substantial
gainful activity since September 15, 2010.  Id.  At step two,
the ALJ found that plaintiff had severe impairments of: "history
of right-sided carpal tunnel syndrome; lumbar and cervical
degenerative disc disease with cervical radiculitis; low
frequency hearing loss; obesity; delusional disorder; and
adjustment disorder with mixed anxiety and depression mood."
Id.  The ALJ considered plaintiff's allegation that she suffers
from sinusitis, but found that because the condition did not
cause significant limitations, and was managed by medication, it
was not severe.  Id.

At step three, the ALJ found that plaintiff's impairments,
either alone or in combination, did not meet or equal an
impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr.
20-23).  Before moving on to step four, the ALJ found that
plaintiff had the residual functional capacity ("RFC"):

> [T]o lift and/or carry twenty pounds occasionally and
> ten pounds frequently; stand and/or walk about six
> hours in an eight-hour workday but for no more than
> two hours at a time; sit for a total of about six
> hours; push and or pull within the weight restrictions
> described for lifting and carrying; frequently climb
> ramps and stairs but no climbing of ladders, ropes or
> scaffolds; frequently balance, stoop, kneel, crouch
> and crawl; only occasionally reach overhead with the
> right arm but could otherwise frequently reach with
> the right upper extremity; she is further limited to
> routine, repetitive tasks that require only occasional
> interaction with co-workers and supervisors; and no
> interaction with the general public.

(Tr. 23). In making the RFC determination, the ALJ considered

plaintiff's subjective complaints and found that plaintiff's testimony about her level of pain and inability to work were not entirely credible. (Tr. 23-32). As part of the credibility assessment, the ALJ noted that plaintiff's credibility was reduced due to her inaccurate statements that she had not abused drugs or been arrested.  (Tr. 32).  The ALJ further observed that the plaintiff had described her ability to walk long distances and exercise regularly, as well as perform ordinary household tasks.  (Tr. 28, 32). The ALJ also considered the clinical findings, diagnostic tests, and physical examinations, and determined that the evidence did not substantiate plaintiff's allegations.  (Tr. 23-32).

At step four, the ALJ found that plaintiff is unable to perform any past relevant work. (Tr. 33). At step five, considering plaintiff's age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that plaintiff can perform. (Tr. 34). Ultimately, the ALJ found plaintiff not disabled from September 15, 2010, through the date of the ALJ's opinion. (Tr. 35).

## VI.  SUBSTANTIAL EVIDENCE REVIEW

### A. HEARING TESTIMONY

On December 5, 2012, plaintiff testified before ALJ Kuperstein at a hearing in New Haven, Connecticut.  (Tr. 49). Plaintiff was represented at the hearing by Attorney Olya

Yellner.  (Tr. 41).  On the date of the hearing, plaintiff was forty eight years old.  (Tr. 49).  She was single, had no children, and lived at a homeless shelter.  Id.  At the shelter she would clean and report to a case manager.  Some of the chores she performed included cleaning windows and showers, and scrubbing toilets.  (Tr. 86).

Plaintiff had a driver's license, but did not drive due to reduced range of motion in her right arm and neck.  (Tr. 52).  She took public transportation, but was careful when doing so because she suffered a fall on a bus in the past.  (Tr. 53).  Plaintiff is a high school graduate and she took classes at Norwalk Community College, although she did not attain a degree.  Id.  Plaintiff last worked at Macy's, ending in January 2009.  (Tr. 54).  In 2007, she worked as a greeter at Verizon Wireless which entailed "a lot of customer service and dealing with the public."  (Tr. 55).  Plaintiff worked at Karp's Hardware in 2002 as a cashier and in customer service.  (Tr. 56).  She would stock shelves for about a half hour a day.  (Tr. 57).  She left this position due to stress following the deaths of her parents.  Id.  Plaintiff has also worked as a sales assistant at Salomon Smith Barney, an investment banking firm.  (Tr. 58).

At the time of the hearing plaintiff volunteered at the Maritime Aquarium in Norwalk, Connecticut.  (Tr. 59).  She had worked full-time at the Aquarium but had reduced her volunteering to eight hours a week due to pain and difficulty lifting.  (Tr. 60).  Plaintiff was limited in her job search by the poor function of her right hand and by her hearing

difficulties.  (Tr. 62).  Although she felt that her poor
hearing would prevent her from wearing headsets, an audiologist
had recently told her that she did not need hearing aids.  Id.

Plaintiff asserted that she is disabled because of a
reduced range of motion, pain, and stiffening in her right hand
and wrist.  (Tr. 64-65).  Her wrist was originally injured in a
car accident.  She also alleged neck, back, and lower lumbar
pain that prevents her from bending over and from being able to
lift more than ten pounds.  (Tr. 65).  While she could lift ten
pounds with her left hand, she could only lift five pounds for a
short amount of time with her right hand.  Id.  Plaintiff had
pain while sitting, and could sit at most for two hours at a
time before needing to stand up.  (Tr. 66).  Plaintiff did not
have issues walking but would have discomfort when standing for
a full eight hour day at the aquarium.  (Tr. 68).  She could
usually stand and walk for about half an hour before needing to
take a break to sit down, but at times during 2011 she could
only stand for ten minutes before experiencing pain.  (Tr. 70-
71).  At the time of the hearing plaintiff could work for about
two hours before needing a ten or fifteen minute break.  (Tr.
72).

Plaintiff smoked two to three cigarettes a day and only
infrequently drank alcohol.  (Tr. 73).  She denied the use of
illicit drugs since September 2010.  (Tr. 74).  Plaintiff has
sung in a gospel choir, and sings and writes her own rock songs.
(Tr. 75).

Upon questioning from her attorney, plaintiff recounted

10

being threatened in the past by the current police chief of New
Haven, Connecticut.  (Tr. 77-78).  She indicated that she also
had problems with the police in Stamford, Connecticut.  (Tr. 78-
79).  She noted that a police officer had been stalking her
before his death, and that this officer's wife had stabbed her
in the past.  (Tr. 79).  Her right hand had scars from surgeries
and the stabbing.  (Tr. 82).

As to her neck pain, she added that it would radiate down
into her right arm.  (Tr. 83).  The range of motion in her neck
was reduced for side to side and up and down movements.  Id.
She suffered from acute sinusitis, but it was improved with
medication.  (Tr. 85).  Her right finger issues prevented her
from using small clasps and handling coins.  (Tr. 87).

Albert Sabella, vocational expert, also testified at the
hearing.  (Tr. 91).  He identified plaintiff's past work as
retail sales clerk, cashier, and administrative clerk.  (Tr.
92).  After reciting essentially the same RFC that he eventually
found, the ALJ questioned whether a person with that RFC could
perform plaintiff's past work.  Mr. Sabella opined that a person
with such an RFC would not be able to perform any of the past
work, but would be able to perform assembly work, cleaning work,
and inspection work.  (Tr. 94-96).  When questioned about
reduced handling with the right hand and additional pulmonary
restrictions, Mr. Sabella removed these jobs.  (Tr. 98).
However, if the pulmonary issues were not a concern, Mr. Sabella
determined that such an individual would be able to work as an
ironer, blending tank tender, bakery worker, laminator, or food

distributor.  (Tr. 99).

**B. DISABILITY DETERMINATION EXPLANATIONS**

**1. DI DISABILITY DETERMINATION EXPLANATIONS**

Dr. Adrian Brown, who reviewed the medical evidence and issued an opinion concerning plaintiff's mental functioning, noted that plaintiff has three medically determinable impairments: a primary impairment diagnosis of disorders of back-discogenic and degenerative, a secondary impairment of alcohol, substance addiction disorders, and an "other" impairment of affective disorder.  (Tr. 113).  Dr. Brown classified "A" criteria to be 12.04 affective disorders and 12.09 substance addiction disorders. He found that plaintiff had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation.  Id.  He identified no "C" criteria.

Dr. Joseph Connolly Jr. reviewed the medical records and rendered an opinion on plaintiff's physical functioning.  He found that plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds.  (Tr. 115). He opined that she could stand, walk, or sit, for about six hours in an eight hour day.  Id. As to plaintiff's postural limitations, he found that she could: frequently climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; and

frequently balance, stoop, kneel, crouch and crawl.  Her right
overhead reaching was  limited, but she had no handling,
fingering, or feeling limitations.  (Tr. 116).  He determined
that she could perform light work and, therefore, was not
disabled.  (Tr. 117).

The disability determination at the reconsideration level
was identical, except that plaintiff was now found to have
limited fingering abilities in her right hand. (Tr. 143).

## 2. DIB DISABILITY DETERMINATION EXPLANATIONS

The DIB reviewers reached the same physical findings as did
the doctors at the DI reconsideration level.  (Tr. 142-43, 157-
58).  Dr. Robert DeCarli, PsyD, assessed plaintiff's mental
functioning at the initial and reconsideration levels.  He
determined that plaintiff had no limitations in understanding,
memory, concentration and persistence.  (Tr. 144, 159).  He
opined that she was moderately limited in interacting
appropriately with the general public, and in her ability to
accept instructions and respond appropriately to criticism from
supervisors.  Id.  He found that she could interact with
coworkers and supervisors while doing individual work and that
it would be best for her to avoid interactions with the general
public.  Id.

## C. ACTIVITIES OF DAILY LIVING

Plaintiff completed an activities of daily living  report
on September 21, 2011.  (Tr. 282-89).  She lived in a shelter

and during the day she wrote that she would "shower, dress, make bed, chore, breakfast, walk, job search, lunch, food shopping, computer work, research, attend group, volunteer . . . [doctor's appointments], take bus and train, wash clothes and [i]ron . . . exercise, will be starting physical therapy . . . help people, help all the time." (Tr. 282). She identified pain in her right arm, wrist, shoulder, knee, and throughout her lower back and neck. (Tr. 283). She noted no problems with her personal care. The only medicine she was taking was 800mg Ibuprofen. (Tr. 284).

She was a good cook, but could not cook at the shelter. Id. The chores she did perform were cleaning, laundry, ironing, dusting, sweeping, making her bed, scrubbing bathrooms, cleaning windows, and light gardening. (Tr. 285). Plaintiff would walk or use public transportation to get around. She shopped for basic items, and was able to manage money. (Tr. 286). Her interests included going on the computer, reading, writing, walking, thinking, watching sports on television, painting, drawing, playing softball, and bird watching. Id. The pain caused by her conditions made these activities more difficult to do. She did not spend time with others, and had no relationship with her family[1] due to problems and altercations in the past. (Tr. 287).

Her conditions affected her capabilities with lifting, squatting, bending, standing, reaching, walking, sitting,

---

[1] Plaintiff described her family as "Barbaric Baboons." (Tr. 287).

14

kneeling, hearing, stair climbing, memory, getting along with others, and using hands.  Id.  She could walk eight miles before needing a fifteen minute rest.  She had a great attention span, could follow written and spoken instructions well, and could handle stress.  (Tr. 288).  She indicated that her unusual fears were "[s]hooting very aware, Stamford Police DO NOT TRUST!! (Terrorist) Always on lookout [sic]."  Id.

### D. MEDICAL RECORDS

Plaintiff began treating at Southwest Connecticut Mental Health ("SCMH") on September 9, 2004.  (Tr. 366).  She was at SCMH after being brought to the emergency room for suicidal ideation.  Id.  On February 27, 2006, plaintiff was arrested for drinking too much alcohol and creating a disturbance.  (Tr. 380).  Plaintiff presented to SCMH on April 22, 2007, expressing suicidal ideation and depression after drinking three glasses of wine.  (Tr. 382).  She was diagnosed with major depressive disorder and alcohol abuse.  (Tr. 385).  During this time plaintiff's mental conditions were worsened because she was drinking to handle her anxiety.  Treatment notes revealed that drinking also lead to mental confusion.  (Tr. 393).  She was prescribed Zoloft on May 7, 2007.  (Tr. 430).  By December 17, 2007, plaintiff was doing better on her medications and had stopped drinking.  (Tr. 406).  On March 17, 2008, plaintiff was noted as being happier and working full-time at Verizon.  (Tr. 412).  Plaintiff continued treating at SCMH until July 2008. (Tr. 433).

Plaintiff presented to Stamford Hospital on January 26, 2010, after slipping and falling on a bus the day before.  (Tr. 570).  She had her usual decreased range of motion in her right arm and was tender in her paraspinous muscle and lumbar area, but was able to ambulate normally.  Id.  X-rays of her cervical spine revealed osteophytes, mild arthritis, and no fractures. (Tr. 574).  Lumbar spine x-rays revealed mild degenerative changes, with no vertebral compression and normal alignment. (Tr. 575).

On March 9, 2010, plaintiff followed-up with Optimus to treat injuries resulting from her prior fall on the bus.  (Tr. 438).  X-rays revealed no fractures.  Id.  Her chronic pain was noted, and she was referred to physical therapy.  (Tr. 439). Plaintiff was at Stamford Hospital on March 11, 2010.  She noted pain in her right arm and back, but was still able to carry a basket of laundry up and down a flight of stairs.  (Tr. 587). She was prescribed stretching and physical therapy.  (Tr. 592-93).  On April 9, 2010, plaintiff was at Stamford Hospital for a follow-up and it was noted that she "no longer has any pain complaints, just clicking."  (Tr. 588).  A treatment note from October 22, 2010, reveals that plaintiff reported no pain.  (Tr. 605).  Plaintiff was intoxicated when she arrived at the hospital, having ingested a "quart of gin" that day.  (Tr. 622). She was assessed as a minimal risk for suicide.  (Tr. 636).

Plaintiff was at Cornell Scott-Hill Health Center ("CSHHC") for a mental health and substance abuse evaluation on November 23, 2010.  (Tr. 479-87).  Her history of alcohol abuse, suicidal

ideations, decreased sleep, and decreased appetite were all noted. (Tr. 479). It was noted that while plaintiff had a cord to strangle herself with, she had not made an attempt. (Tr. 480). A progress note from November 29, 2010, revealed: chronic joint pain in her right arm, wrist, and knee, for which she was prescribed 800mg Ibuprofen; depression; and anxiety. (Tr. 458). Plaintiff was depressed and expressed feelings of helplessness and hopelessness during a session at CSHHC on December 16, 2010. (Tr. 527).

On January 10, 2011, plaintiff was at CSHHC, reporting depressed mood, increased anxiety, and increased fatigue. (Tr. 488). Mental examination revealed constricted and blunted affect, with a depressed and anxious mood. (Tr. 490). She was prescribed Zoloft 50mg. (Tr. 491). By January 24, 2011, the Zoloft was beginning to have a positive impact on her anxiety and mood. (Tr. 499). The next day, however, she reported that she usually experienced medium to high levels of depression. (Tr. 517). While she was depressed and anxious on February 7, 2011, on February 9, 2011, plaintiff reported that she was doing better, and noted that medication was helping her mood. (Tr. 512, 497). Plaintiff was irritable during sessions on February 16 and February 25, 2011, but refused a recommended increase in her medication. (Tr. 510, 508). Plaintiff reported that "[s]he was proud of her ability to control her emotions," on February 28, 2011, during a session at CSHHC. (Tr. 506).

On March 7, 2011, plaintiff reported in a group session at CSHHC that establishing personal boundaries helped reduce her

17

depression.  (Tr. 505).  During a visit at CSHHC, plaintiff reported that her mood was improved after taking Zoloft on March 9, 2011.  (Tr. 495).  Laura Thompson, APRN, noted that plaintiff was less irritable, was sleeping better, and didn't have alcohol cravings.  (Tr. 496).  During a group session on March 28, 2011, plaintiff reported that communicating her needs helped to reduce her depression.  (Tr. 503).

On April 6, 2011, it was noted that plaintiff had a history of using alcohol, crack, cocaine, and cannabis.  (Tr. 475). Plaintiff reported that she was depressed most days and had decreased energy and sleep.  (Tr. 474).  Although plaintiff sought treatment for back and neck pain on August 15, 2011, physical examination revealed full range of motion in her neck, back, and spine.  (Tr. 656).

On September 1, 2011, Dr. Soussan Ayubeha prescribed plaintiff Motrin in order to better manage her pain after Tylenol did not prove effective.  (Tr. 652).  Dr. Ivy Lorilla treated plaintiff on September 7, 2011, for pain in plaintiff's hand, wrist, knee, neck, and lower back.  (Tr. 650).  Plaintiff reported clicking and pain in her back, but examination revealed normal range of motion.  Id.  Plaintiff had an MRI of her cervical spine taken on September 16, 2011.  The impression was:

> At C5-C6, there is a moderate broad-based central and a left foraminal disc protrusion with mild to moderate mass effect upon the ventral aspect of the thecal sac and moderate to severe asymmetric left foraminal narrowing.  At C6-C7, there is a mild broad-based central disc protrusion causing mild central spinal stenosis.

(Tr. 674).

During treatment on September 22, 2011, Dr. Weir noted that plaintiff had numbness and reduced strength in her right arm, neck stiffness with reduced range of motion, crepitus in her neck and lower back, and lumbar back pain that radiated down her right thigh. (Tr. 648). Dr. Weir also prescribed Veramyst spray for plaintiff's sinusitis. Id.

Plaintiff attended physical therapy at Norwalk Hospital from September 23, 2011, through October 28, 2011. (Tr. 681-719). After therapy her mobility and range of motion had increased. Her pain had been decreased by fifty percent, and "[h]er tolerance to lifting and performing laundry tasks have improved to not having significant restriction as she is able to equally distribute weight b/w upper extremity." (Tr. 719).

Plaintiff had a lumbar spine MRI on September 26, 2011. The impression was that, "[t]here are predominantly RIGHT-sided foraminal disc protrusions at L2-L3, L3-L4 and L4-L5, greatest at L3-L4 with associated foraminal narrowing which is mild to moderate greatest at L3-L4." (Tr. 673).

Plaintiff was seen by David Guggenheim, PsyD, on September 29, 2011. He noted that she was seeking therapy due to anxiety regarding her physical problems. She told Dr. Guggenheim that ordinarily she was a seven out of ten on a happiness scale of one to ten. (Tr. 758). He expressed a need to investigate delusional thinking after plaintiff shared that press would follow her at certain events she attended. Id. Dr. Guggenheim diagnosed plaintiff with "[a]djustment disorder with mixed anxiety and depressed mood." Id.

19

On October 5, 2011, plaintiff reported to Dr. Guggenheim
that she was doing better at handling stress. (Tr. 753). He
noted that her judgment was minimally impaired and that her
insight was moderately impaired. Id. On October 13, 2011,
plaintiff expressed that she had been stressed during the week,
but that she was able to cope well. (Tr. 877). Plaintiff
reported experiencing a panic attack on October 24, 2011. (Tr.
749). Dr. Jonathan Horowitz, during a session on October 26,
2011, noted that plaintiff might have "a persecutory delusional
disorder of mild intensity." (Tr. 747). During a therapy
session on November 1, 2011, plaintiff reported that she had
consumed four beers in six hours a few days before the session.
(Tr. 742). On November 15, 2011, Dr. Guggenheim again expressed
concerns that plaintiff was having delusions, noting an increase
in paranoid content. (Tr. 739). He also noted that plaintiff
was able to manage her "mild feelings of depressed mood and
anxiety. . . ." Id.

Plaintiff expressed delusional thinking on December 15,
2011, relating to Dr. Guggenheim that she had received an email
from the President of the United States thanking her for working
on United States defense. (Tr. 867). On December 22, 2011, Dr.
Weir prescribed Omnaris spray to replace the Veramyst spray that
plaintiff was using to treat her sinusitis. (Tr. 799). On
January 6, 2012, Dr. Weir noted that plaintiff's sinus pain had
improved. (Tr. 797). She also recommended a change to naproxen
for treatment of plaintiff's back pain. Id. Dr. Guggenheim
noted potential delusional thinking and that plaintiff was able

to manage her mild feelings of depression and anxiety.  (Tr. 860).

On March 28, 2012, plaintiff woke up with a severe muscle spasm in her neck that radiated pain into her lower back and right hand.  (Tr. 855).  To treat this she was prescribed ketorolac tablet, 10mg, and Robaxin, 750mg.  Id.  Plaintiff had an x-ray on March 29, 2012, that revealed, "[m]oderate degenerative disc disease along with [diffuse idiopathic skeletal hyperostosis]."  (Tr. 827).  Following the x-ray, plaintiff was prescribed physical therapy on April 2, 2012. (Tr. 825).  On that same day she noted that she had been doing better up until a week before April 2, when she woke up with pain in her neck that radiated down into her right arm, hand, and fingers.  (Tr. 937).  Prednisone and vicodin helped to manage her pain.  (Tr. 939).

Delusional thinking was noted on April 24, 2012, but Dr. Guggenheim also noted that plaintiff was able to manage her mild depression and anxiety.  (Tr. 850).  Plaintiff sought treatment on April 30, 2012, after a magazine was thrown into her eye, injuring it, which caused her to leap out of bed, which injured her back.  (Tr. 829).  Dr. Guggenheim noted, on May 29, 2012, that while plaintiff was mildly depressed and anxious she was able to manage those symptoms.  (Tr. 847).  Dr. Lawrence Lefkowitz noted that plaintiff was improving with physical therapy exercises.  (Tr. 929).  On July 27, 2012, Dr. Lefkowitz added that plaintiff felt that, "she ha[d] reached a point of stability and [was] 'living with' the situation."  (Tr. 948).

On August 2, 2012, plaintiff ended her psychiatric treatment at Community Health Center.  It was noted that, "[Plaintiff] reported that she was doing very well and continues to volunteer and be active in community.  She stated that she does not feel she needs BH services at this time and asked to close her BH case." (Tr. 843).  On September 14, 2012, plaintiff reported pain in her right upper arm and tingling in the fingers of her right hand, but also informed the doctor that she had been "doing okay for a long time." (Tr. 928).

In October and November of 2012, plaintiff sought treatment for left thumb triggering and pain.  Treatments proved effective at managing the pain.  (Tr. 923-24).  On November 16, 2012, plaintiff had an audiological evaluation that revealed mild lower frequency loss.  (Tr. 958).  Hearing aids were not recommended.

### E. MEDICAL OPINIONS

Mark Waynik, M.D. performed a consultative evaluation on November 8, 2011.  (Tr. 723-25).  He noted: "There is no overt psychosis with no disorders of perception and no paranoia. Thought processes are logical.  There are no delusions." (Tr. 725).  Dr. Waynik diagnosed plaintiff with dysthymia and alcohol abuse.

Hossein Samai, M.D., performed a consultative evaluation on December 12, 2011.  (Tr. 792-96).  He noted plaintiff's back and neck pain, and her right arm and right finger weakness.  (Tr. 794).  Examination revealed reduced range of motion on the right

side of plaintiff's neck.  (Tr. 795).  Dr. Samai's impression,
after noting plaintiff's history of car accidents with neck and
back injuries, was that "physically it seems she is doing all
right and she is able to do a lot of function and she is not
limping very much, limping is not very severe.  Psychologically
she is okay except she says she is stressed out."  (Tr. 796).

Dr. Katie Carhart completed a doctor's questionnaire on
February 1, 2012.  (Tr. 809-12).  She noted that plaintiff's
condition had worsened since her treatment had begun, and listed
her diagnoses as delusional disorder and adjustment disorder
with mixed anxiety and depressed mood.  (Tr. 809).  In the five
areas of activities of daily living, Dr. Carhart found that the
only problem plaintiff had was an obvious problem with handling
frustration appropriately.  (Tr. 810).  In the area of social
interaction, Dr. Carhart opined that plaintiff had: a slight
problem with interacting appropriately with others in a work
environment; no problem with asking questions or requesting
assistance; an obvious problem with respecting and responding
appropriately to others in authority; and a slight problem with
getting along with others without distracting them or exhibiting
behavioral extremes.  (Tr. 811).  She noted that plaintiff had
no problems with any area of task performance.  Id.

## VII. DISCUSSION

Plaintiff makes a number of arguments in support of
reversal and/or remand of the Commissioner's final decision
denying disability. For the reasons that follow, the Court

23

**DENIES** plaintiff's Motion to Reverse or Remand, and **GRANTS** defendant's Motion to Affirm.

### A.   ALJ'S CHARACTERIZATION OF THE EVIDENCE

Plaintiff argues that the ALJ misunderstood, and therefore mischaracterized, her statements because of her delusional disorder.  Pl. Br. at 13.  She first takes issue with the ALJ's notation about plaintiff's musical abilities.  (Tr. 26).  Plaintiff claims that these are erroneous her delusional disorder prevented her from accurately presenting reality.  The ALJ, however, was not making findings; rather, he was summarizing plaintiff's testimony at the hearing.  Id.  ALJ Kuperstein accurately recounted this testimony, and therefore, did not commit an error.  Plaintiff also argues that the ALJ's statement that plaintiff denied feeling depressed to Dr. Waynik was an error.  (Tr. 28).  However, as she admits in her brief, that is exactly what she said to Dr. Waynik.  (Tr. 723).  Therefore, there was no error.

Plaintiff next argues that the ALJ erred by failing to include her cervical and lumbar spine impairments in formulating her RFC.  Pl. Br. at 13.  These conditions were included in the formulation, however, as the ALJ found that plaintiff was limited to light work and that she could not climb ladders, ropes, or scaffolds.  (Tr. 23).  The contention that the ALJ did not consider these impairments in finding that plaintiff could perform light work is not supported by the record.  Therefore, there was no error.

Finally, plaintiff argues that the ALJ erred in stating that plaintiff could describe her past jobs in great detail because she needed to refer to her resume during the hearing. Pl. Br. at 13-14.  Plaintiff testified that she needed her resume in order to recall the specific dates that she worked at her various positions.  (Tr. 54).  She was, however, able to relate specific details about her work that would not have been contained on her resume, and a reading of her testimony as a whole on this issue supports the ALJ's finding.  (Tr. 54-59).  Therefore, the ALJ did not err in stating that plaintiff could describe her past jobs in great detail.

**B.   STEP THREE**

Plaintiff argues that her delusional disorder meets the requirements of impairment 12.03 of 20 C.F.R. Part 404, Subpart P, Appendix 1.  Pl. Br. at 18-21.

A claimant who meets or equals the requirements of a Listing is "conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir.1995); see 20 C.F.R. §§404.1520(a)(4)(iii), 416.920(a)(4)(iii) ("If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.").  The claimant bears the burden of proof at step three to show that her impairments meet or medically equal a listing.  Johnson v. Astrue, 748 F. Supp. 2d 160 (N.D.N.Y. 2010) (citing Yuckert, 482 U.S. at 146).  To show that an impairment meets a listing, a

claimant must show that the impairment satisfies all of the specified medical criteria. Sullivan v. Zebley, 493 U.S. 521, 530 (1990). Here, substantial evidence supports the ALJ's finding that the plaintiff did not meet her burden.

The parties focus their arguments on the paragraph B requirements of Listing 12.03.[2] In order to meet the paragraph B requirements, an individual must show that they have at least two of the following, "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.03(B). The ALJ found that plaintiff had a mild restriction in her activities of daily living, moderate difficulties in social functioning, mild difficulties with concentration persistence or pace, and no episodes of decompensation. (Tr. 22).

Plaintiff is only mildly restricted in her activities of daily living. Activities of daily living "include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404,

---

[2] Plaintiff meets the paragraph A requirements because she has been diagnosed with a delusional disorder. (Tr. 740, 809), 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.03(A). Plaintiff does not argue, and the record does not support the contention, that she meets the requirements of paragraph C of the listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.03(C).

Subpt. P, App. 1 §12.00(C)(1).  As ALJ Kuperstein noted,
plaintiff is able to perform chores, cook, volunteer, maintain
appointments, and exercise daily.  (Tr. 21).  Plaintiff has
stated that she does laundry, cleans, takes the bus, and has no
problems with showering, dressing, or other personal care.  (Tr.
282-85).  In the five areas of activities of daily living, Dr.
Carhart found that the only problem plaintiff had was an obvious
problem with handling frustration appropriately.  (Tr. 810).
The state reviewers, Dr. Brown and Dr. DeCarli, both found that
plaintiff was only mildly restricted in her activities of daily
living.  (Tr. 113, 140).  This represents substantial evidence
that plaintiff had only mild limitations in her activities of
daily living.  Richardson, 402 U.S. at 401.

     Plaintiff has no more than moderate difficulties in social
functioning.  "Social functioning" refers to the claimant's
"capacity to interact independently, appropriately, effectively,
and on a sustained basis with other individuals." It includes
"the ability to get along with others, such as family members,
friends, neighbors, grocery clerks, landlords, or bus drivers."
20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.00(C)(2).  ALJ
Kuperstein found that although plaintiff had paranoid and
delusional thinking, she was able to interact appropriately with
a wide range of people.  (Tr. 21).  She was in a choir, "loves"
her co-workers at the aquarium, attended group therapy, and was
able to socialize with friends.  (Tr. 21, 75-76, 80).  In the
area of social interaction, Dr. Carhart opined that plaintiff
had: a slight problem with interacting appropriately with others

in a work environment; no problem with asking questions or
requesting assistance; an obvious problem with respecting and
responding appropriately to others in authority; and a slight
problem with getting along with others without distracting them
or exhibiting behavioral extremes.  (Tr. 811).  Notably, Dr.
Carhart did not find any serious or very serious problems.  The
state reviewers found that plaintiff had only mild restrictions
in social functioning.  (Tr. 113, 140).  This evidence
represents substantial evidence that plaintiff had at most
moderate difficulties in social functioning.  Richardson, 402
U.S. at 401.

Plaintiff has only mild difficulties with regard to her
abilities of concentration, persistence or pace.  The domain of
maintaining concentration, persistence, or pace, "refers to the
ability to sustain focused attention and concentration
sufficiently long to permit the timely and appropriate
completion of tasks commonly found in work settings." 20 C.F.R.
Pt. 404, Subpt. P, App. 1 §12.00(C)(3).  The ALJ noted that
plaintiff was able to effectively work at the aquarium, could
read books, and was able to successfully complete a cooking
class.  (Tr. 22).  Plaintiff reported that she had no problems
completing tasks, had "great attention," and was able to "pay
attention for hours."  (Tr. 287-88).  The state reviewers found
that plaintiff had no limitations in this area.  (Tr. 113, 140).
Dr. Carhart also opined that plaintiff had no limitations in
this area.  Plaintiff's own statements, the evidence in the
record, and the opinions of medical professionals all constitute

substantial evidence that plaintiff has no more than mild difficulties in the area of maintaining concentration, persistence, and pace.  Richardson, 402 U.S. at 401.

Plaintiff's primary argument is that plaintiff's delusions cause her to exaggerate her personal levels of functioning. Even if plaintiff's statements were not considered, the opinions of the state reviewers, Dr. Carhart, Dr. Waynik,[3] and Dr. Samai,[4] all support the conclusions the ALJ reached.  Therefore, the ALJ committed no error at Step Three.

### C.   TREATING SOURCE RULE

Under the "treating physician rule," the ALJ is required either to give the opinion of a treating physician controlling weight, or to explain the reasons for discounting that opinion. 20 C.F.R. §404.1527(c)(2); see Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2009).  An ALJ who refuses to give controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. 20 C.F.R. §404.1527(c)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors

---

[3] Dr. Waynik determined that plaintiff had "no overt psychosis with no disorders of perception and no paranoia.  Thought processes are logical.  There are no delusions."  (Tr. 725).
[4] Dr. Samai found that, "[p]sychologically she is okay except she says she is stressed out."  (Tr. 796).

brought to the Social Security Administration's attention that tend to support or contradict the opinion. Id.

The regulations also specify that the Commissioner "will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion." Id.; see also Schaal, 134 F.3d at 503-04 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion). "Nevertheless, where 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" Petrie v. Astrue, 412 F. App'x 401 (2d Cir. 2011) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983)).

The Second Circuit has indicated that "[a] medical opinion may be given significant weight only if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Poupore v. Astrue, 566 F.3d 303, 307 (2d Cir. 2009)(citing 20 C.F.R. §404.1527(c)(2)). This substantial evidence includes "the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). The opinions of reviewing physicians can override treating physicians' opinions where the reviewing physician's opinions are "supported by evidence in the record." Schisler v. Sullivan,

3 F.3d 563, 568 (2d Cir. 2003).

Plaintiff argues that the ALJ erred by claiming to assign Dr. Carhart's opinion "great weight," while not discussing her notations that plaintiff had "issues respecting authority," and severely impaired insight. (Tr. 810-11). However, the ALJ specifically noted Dr. Carhart's finding as to plaintiff's ability to respect authority. (Tr. 31). There is no error as to this point, and plaintiff's attorney is cautioned against making arguments without carefully reviewing the record.

The ALJ did not specifically mention in his opinion Dr. Carhart's notation that plaintiff had severely impaired insight. Courts in our Circuit have held that, "where 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" Petrie, 412 F. App'x at 401 (citation omitted). Here, the ALJ mentioned that Dr. Carhart noted plaintiff's delusions, and then thoroughly examined the rest of Dr. Carhart's opinion. The remainder of her opinion, however, does not support a finding of disability. Petrie does not require more than the ALJ has done, and therefore, there was no error.

Plaintiff also argues that the ALJ did not discuss the opinion of Dr. Guggenheim. Dr. Guggenheim co-signed the opinion of Dr. Carhart, to which the ALJ assigned great weight. There is no reason that an ALJ should be required to parse the same

31

opinion twice solely because two doctors co-signed that opinion. Plaintiff also argues that Dr. Guggenheim's diagnosis of delusional disorder should have been assigned a weight by the ALJ.  The ALJ did consider this impairment at step two, step three, and during his RFC evaluation.  (Tr. 20-33).  Further, Dr. Guggenheim noted on a few occasions that plaintiff was doing well with her conditions.  (Tr. 739, 753, 844, 861).  These findings, along with his co-signing of Dr. Carhart's opinion, show that Dr. Guggenheim did not consider plaintiff to be as disabled as plaintiff suggests.  The ALJ's reading of these doctors' opinions is fair, as both found no serious or very serious problems in any area of plaintiff's functioning.  (Tr. 810-11).  They did not find limitations, as plaintiff proffers without support, that require a finding of disability. Therefore, the ALJ did not err in failing to assign a specific weight to Dr. Guggenheim's treatment notes.

### D.   CREDIBILITY

Plaintiff argues that the ALJ erred in his assessment of plaintiff's credibility.  Pl. Br. at 23.

The courts of the Second Circuit follow a two-step process for credibility determinations. The ALJ must first determine whether the record demonstrates that the plaintiff possesses a medically determinable impairment that could reasonably produce the alleged symptoms.  20 C.F.R. §416.929(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory

findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.").

Second, the ALJ must assess the credibility of the plaintiff's complaints regarding the intensity of the symptoms. The ALJ is first required to determine if objective evidence alone supports the plaintiff's complaints; then, if the evidence does not support the claims, the ALJ must consider other factors laid out at 20 C.F.R. §416.929(c). See, e.g., Skillman v. Astrue, No. 08-CV-6481, 2010 WL 2541279, at *6 (W.D.N.Y. June 18, 2010).  These factors include activities of daily living, medications, and the plaintiff's response thereto, treatment other than medication and its efficacy, and other relevant factors concerning limitations.  20 C.F.R. §416.929(c)(3).  The ALJ must consider all the evidence in the case record.  SSR 96-7p, 1996 WL 374186, at *5.  Furthermore, the credibility finding "must contain specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4.

In working through the two step process, the Second Circuit has indicated that it is the Commissioner, not the reviewing

court, who evaluates the credibility of all witnesses, including the plaintiff. <u>Carroll v. Sec'y of Health & Human Servs.</u>, 705 F.2d 638, 642 (2d Cir. 1983). Importantly, "[c]redibility findings of an ALJ are entitled to great deference and . . . can be reversed only if they are 'patently unreasonable.'" <u>Pietrunti v. Director, Office of Workers' Comp. Programs, U.S. Dep't of Labor</u>, 119 F.3d 1035, 1042 (2d Cir. 1997) (citation omitted).

In finding that plaintiff's credibility is limited, the ALJ noted that during her testimony plaintiff was not forthcoming about her alcohol use. Plaintiff indicated that she had a beer in July of 2012, but she testified that other than that she hardly drank alcohol at all. (Tr. 74). However, during a therapy session on November 1, 2011, plaintiff reported that she had drunk four beers in six hours a few days before the session. (Tr. 742). She also drank a quart of gin on October 22, 2010. (Tr. 622). She has admitted that drinking directly led to her thoughts of suicide and depression. <u>Id.</u> The medical records also show that alcohol use exacerbated her condition. (Tr. 380, 382, 393, 622). However, at the hearing she downplayed her issues with alcohol. It was not "patently unreasonable" for the ALJ to reduce plaintiff's credibility based on this finding. <u>Pietrunti</u>, 119 F.3d at 1042.

The medical experts' opinions in this case further takes away from plaintiff's credibility. Dr. Waynik opined that, "[t]here is no overt psychosis with no disorders of perception and no paranoia. Thought processes are logical. There are no delusions." (Tr. 725). Dr. Samai opined that, "physically it

seems she is doing all right and she is able to do a lot of function and she is not limping very much, limping is not very severe.  Psychologically she is okay except she says she is stressed out." (Tr. 796).  Dr. Carhart opined that plaintiff had no serious or very serious limitations, and mostly found that plaintiff had no issues.  (Tr. 810-11).  The state medical experts all found that plaintiff was not disabled and that her conditions were generally mild in nature.  (Tr. 130, 144).  All of these opinions, which endorse a finding that plaintiff is not disabled, take away from plaintiff's credibility regarding the intensity of her condition.

Although plaintiff argues that she has high levels of pain, the medical evidence of record, rather than supporting plaintiff's claims of disability, indicates that with treatment she was able to manage her conditions and show improvement. (Tr. 505, 506, 588, 605, 719, 753, 758, 739, 847, 850, 860, 877, 923-24, 928, 939, 948).  Importantly, after receiving physical therapy, plaintiff's back pain was significantly reduced.  (Tr. 718-19).  Dr. Lefkowitz indicated, in one of the most recent records, that plaintiff had "some neck and lower back symptoms but she is definitely improving." (Tr. 929).  Physical examinations have at times shown no pain or full range of motion.  (Tr. 497, 512, 650, 656).  X-rays and MRIs have also shown only mild or moderate issues.  (Tr. 438, 574-75, 673-74, 827).  Finally, plaintiff ended her psychiatric treatments on August 2, 2012, stating that she was "doing very well," and that she no longer needed the mental health services.  (Tr. 843).

35

All of this evidence represents substantial evidence that the ALJ reviewed in considering plaintiff's credibility.  Given the deferential standard given to credibility determinations, it was not "patently unreasonable" for the ALJ to find that plaintiff was not fully credible.  <u>Pietrunti</u>, 119 F.3d at 1042.

### E.    STEP FIVE AND RFC

At step five of the analysis, the burden shifts to the Commissioner to demonstrate that there are a substantial number of jobs available in the national economy for Plaintiff to perform. <u>Balsamo</u>, 142 F.3d at 80.  The Commissioner will utilize the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Part 404, Subpart P, Appendix 2. <u>Pratts</u>, 94 F.3d at 38–39. However, "if a claimant has nonexertional impairments which 'significantly limit the range of work permitted by his exertional limitations,' then the Commissioner cannot rely upon the grids, and instead 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform.' " <u>Griffith v. Astrue</u>, No. 08-cv-6004, 2009 WL 909630, at *4 (W.D.N.Y. Mar. 31, 2009) (quoting <u>Pratts</u>, 94 F.3d at 39).

Plaintiff initially takes issue with the hypothetical ALJ Kuperstein presented to the vocational expert.  Pl. Br. at 26. Despite plaintiff's contention that the ALJ did not base his RFC determination on anything, it is clear that he based it in part on the medical experts' opinions.  The ALJ gave evidentiary weight to the opinion of Dr. DeCarli, and the RFC determination

36

he reached is very similar to that opinion.  (Tr. 32-33).  The
ALJ's RFC determination is also supported by the findings of Dr.
Brown and Dr. Connolly.  (Tr. 114).

The other medical experts also support the ALJ's RFC
determination.  Dr. Waynik found that "[t]here is no overt
psychosis with no disorders of perception and no paranoia.
Thought processes are logical.  There are no delusions."  (Tr.
725).  Dr. Samai found that, "physically it seems she is doing
all right and she is able to do a lot of function and she is not
limping very much, limping is not very severe.  Psychologically
she is okay except she says she is stressed out."  (Tr. 796).
Dr. Carhart's opinion supports the RFC determination where she
found that plaintiff had no serious or very serious problems,
and only two obvious problems.  (Tr. 810-11).  The ALJ factored
the obvious problems in to his RFC determination by limiting
plaintiff's contacts to supervisors.  (Tr. 23).

Plaintiff's course of treatment also reveals improvement
when she is compliant with medication.  The most recent
psychiatric records reveal that she has stopped attending
therapy sessions because she was "doing very well. . . ."  (Tr.
843).  On September 14, 2012, plaintiff reported to her doctors
that she had been "doing okay for a long time."  (Tr. 928).  Ms.
Elliot, plaintiff's physical therapist, wrote that plaintiff had
"noted improvements in all functional mobility since beginning
therapy.  Her tolerance to lifting and performing laundry tasks
have improved to not having significant restriction as she is
able to equally distribute weight [between] upper extremities."

(Tr. 719).  Plaintiff has reported that her medications and treatments have been effective at reducing her symptoms.  (Tr. 505, 506, 588, 605, 719, 739, 753, 758, 847, 850, 860, 877, 923-24, 928, 939, 948).

Plaintiff also argues that she is disabled because the vocational expert testified that someone who was off task fifteen percent of the day, who was absent from work twice per month, and who had to move their entire body in order to move their neck would not be employable.  Pl. Br. at 27.  The ALJ, however, found that these limitations were not supported by the record and, as discussed above, made an RFC determination based on the record.  The hypothetical that the ALJ presented to the vocational expert, and then relied upon at step five, was based on his RFC determination, which is supported by substantial evidence.  See Calabrese v. Astrue, 358 F. App'x 274, 276-77 (2d. Cir. 2009) (citing Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d. Cir. 1981)) (stating that the ALJ properly relied on the vocational expert's responses to a hypothetical that was based on the ALJ's RFC assessment, which was found to be supported by substantial evidence).  The ALJ found, and this court agrees, that the vocational expert's testimony satisfied the Commissioner's burden of showing that there existed alternative substantial gainful employment that is suited to plaintiff's physical and vocational capabilities.  Dumas, 712 F.2d at 1554.  There was no error at this step.

## VIII.    CONCLUSION

For the reasons stated, plaintiff's Motion to Reverse the Decision of the Commissioner (**Doc. #17**) is **DENIED.** Defendant's Motion for an Order Affirming the Decision of the Commissioner (**Doc. #18**) is **GRANTED.**

Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this order. Failure to object within fourteen (14) days may preclude appellate review. See 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Rule 72.2 of the Local Rules for United States Magistrates; Small v. Secretary of H.H.S., 892 F.2d 15 (2d Cir. 1989)(per curiam); F.D.I.C. v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995).

SO ORDERED at New Haven this 10ᵗʰ day of June 2015.

_____/s/_____

HON. SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE